IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| MUTUAL OF ENUMCLAW INSURANCE COMPANY,<br><br>Plaintiff,<br><br>vs.<br><br>RANGE LAND & CATTLE CO., LLC, and ALEXIS M. PAUL,<br><br>Defendants. | CV 25-122-M-KLD<br><br>ORDER |

This declaratory judgment action comes before the Court on cross-motions for summary judgment by Plaintiff Mutual of Enumclaw Insurance Company ("Mutual") (Doc. 28) and Defendant Alexis M. Paul ("Paul") (Doc. 32). Mutual and Paul ask the Court to determine whether a state court action implicates one or more "occurrences" under a commercial general liability policy that Mutual issued to Defendant Range Land & Cattle Co., LLC ("Range").[1] For the reasons set forth below, the Court grants Mutual's motion for summary judgment and denies Paul's cross-motion.

[1] Range takes no position in this case. (Doc. 6 at 1–2).

## I. Background

Range is a Montana company that raises and purchases wagyu cattle. (Doc. 30-2 at 4). It hired Lower Valley Processing, Inc. ("Lower Valley") to process cattle into one batch of burger patties labeled as Lot 1400. (Docs. 1-3 at 1, 22 at 5). Between June 26, 2024, and July 10, 2024, Range delivered Lot 1400 patties to eight different restaurants in Flathead County. (Doc. 22 at 5). Some restaurants received a single delivery and others received several. (Docs. 22 at 4–5, 32-2 at 2–3, 6). Paul and other diners at five of those restaurants were infected with E. coli O157:H7 after eating burgers prepared with Lot 1400 patties. (Docs. 22 at 4–5, 30-1 at 1, 30-5 at 1). A public health investigation determined that "the source of the [E. coli] outbreak was waygu beef from one lot number"—Lot 1400. (Docs. 30-1 at 1, 30-5 at 1).

Paul and other diners filed the underlying actions against Range, Lower Valley, and three of the restaurants that served the burgers. (Docs. 1-2, 32-1 at 16–17, 34 at 5). Those parties conditionally settled the underlying actions pending this Court's decision as to the applicable limits under Range's insurance policy. (Doc. 22 at 5).

Range purchased a commercial general liability policy (the "Policy") from Mutual that was in effect at the time of the E. coli outbreak. (Doc. 22 at 2). The

Policy provides financial protection against damages for bodily injury "caused by an 'occurrence.'" (Doc. 1-1 at 38). The Policy provides an "each occurrence" limit of $1,000,000, which applies to bodily injury that arises from "any one 'occurrence.'" (Doc. 1-1 at 15, 48). For more than one "occurrence," an aggregate limit of $2,000,000 applies. (Doc. 1-1 at 15, 48). The Policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Doc. 1-1 at 52).

Mutual filed its complaint in federal court, requesting a declaration that limits its obligation to $1,000,000 because the underlying claims against Range arose from a single occurrence. (Doc. 1 at 10). Paul filed a counterclaim seeking a declaration that the Policy provides coverage up to the $2,000,000 aggregate limit because the underlying claims involved multiple occurrences. (Doc. 5 at 8–9). The parties cross-move for summary judgment to determine the number-of-occurrences question. (Docs. 28, 32).

## II. Legal Standards

### A. Declaratory Judgment

"In a case of actual controversy within its jurisdiction . . . any court of the United States, upon filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or

not further relief is or could be sought." 28 U.S.C. § 2201(a). If subject matter jurisdiction exists, it is within this Court's discretion whether to assert jurisdiction over declaratory judgment actions. *See Countrywide Home Loans, Inc. v. Mortg. Guar. Ins. Corp.*, 642 F.3d 849, 853 (9th Cir. 2011). Here, the parties are properly diverse, and the amount in controversy is sufficient to confer subject matter jurisdiction. *See* 28 U.S.C. § 1332(a). (Doc. 1 at 3–4, 5 at 4, 6 at 1). The Court will exercise its discretion to examine the controversy because the issue presented is one appropriately settled through declaratory judgment.

**B. Summary Judgment**

Summary judgment is appropriate when the movant demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Because jurisdiction rests on diversity, the Court applies the substantive law of the forum state—here, Montana. *See Burlington Ins. Co. v. Oceanic Design & Const., Inc.*, 383 F.3d 940, 944 (9th Cir. 2004) (applying state law in insurance coverage dispute). Under Montana law, the interpretation of an insurance contract presents a question of law. *Heggem v. Capitol Indem. Corp.*, 154 P.3d 1189, 1193 (Mont. 2007).

Here, Mutual and Paul agree on the material facts and dispute only the interpretation of "occurrence" under the Policy. (Docs. 32-1, 34).

### C. Insurance-Policy Interpretation

Courts look at an insurance contract "as a whole and attempt to reconcile the various parts to give each meaning and effect." *Heggem*, 154 P.3d at 1193. Policy terms are given "their usual, common sense meaning as viewed from the perspective of a reasonable consumer of insurance products." *Allstate Ins. Co. v. Wagner-Ellsworth*, 188 P.3d 1042, 1046 (Mont. 2008). Where a policy's language is clear and explicit, that language governs, and courts "may not rewrite the contract . . . but must enforce it as written." *Stutzman v. Safeco Ins. Co. of Am.*, 945 P.2d 32, 34 (Mont. 1997). Ambiguity exists only when a policy "is reasonably subject to two or more different interpretations." *Heggem*, 154 P.3d at 1193.

## III. <u>Discussion</u>

Under Mutual's interpretation, there was one "occurrence" because the underlying plaintiffs' injuries share one cause: E. coli contamination in Lot 1400. (Docs. 29, 33). Under Paul's competing interpretation, there were multiple "occurrences" because Range's deliveries to the restaurants caused the underlying injuries. (Docs. 31, 35). In Paul's view, contamination alone could not cause injury, so the inquiry should focus on the point at which she argues liability attached: when Range "sold and delivered contaminated patties to individual restaurants." (Doc. 31 at 14–15).

### A. Montana's cause test governs the interpretation of "occurrence."

Montana applies a "cause theory" to interpret the term "occurrence" in a liability policy that limits coverage per occurrence. *Heggem*, 154 P.3d at 1195. Under that theory, the occurrence question is viewed "from the perspective of causation—referring to the cause or causes of the damage or injury—and not the number of injuries or claims." *Heggem*, 154 P.3d at 1195.

In *Heggem*, a toddler died after receiving a lethal dose of diphenhydramine from the insured, a daycare provider. *Heggem*, 154 P.3d at 1191. The insurer offered policy limits for one occurrence, and the surviving family members sued the insurer for bad faith. *Heggem*, 154 P.3d at 1193. The family argued that there were several occurrences, including the provider's administration of the toxic dose, an employee's negligent failure to prevent that act, prior administrations of medication to the child, emotional damage from learning of the child's death, and emotional damage from learning of the employee's failure to stop the provider. *Heggem*, 154 P.3d at 1195–97. The court determined that, at the time the insurer made its offer, the family had alleged only one cause of bodily injury to the child: the lethal dose. *Heggem*, 154 P.3d at 1195–96. And the emotional distress claims were "effects, not causes." *Heggem*, 154 P.3d at 1197. Thus, applying the cause theory, there was one occurrence. *Heggem*, 154 P.3d at 1195–97. The policy in that

case used the same definition of "occurrence" at issue here, which the Montana Supreme Court held was unambiguous under a cause-theory construction. *Heggem*, 154 P.3d at 1193–94, 1197.

More recently, the Montana Supreme Court applied the cause theory in an asbestos case and determined that there was more than one "occurrence." *See Nat'l Indem. Co. v. Montana*, 499 P.3d 516, 542 (Mont. 2021). The insurer argued that the underlying plaintiffs' injuries stemmed from one cause, the State of Montana's "singular decision" to follow a 1942 Attorney General opinion. *Nat'l Indem. Co.*, 499 P.3d at 541. The court disagreed, holding that the opinion "may provide an explanation as to why the State failed to warn," but "the State's multiple decisions over the course of more than a decade to withhold certain information caused the claimants' injuries." *Nat'l Indem. Co.*, 499 P.3d at 542. The definition in that case differed from the Policy at issue here, defining "occurrence" as "an event, *or* a continuous or repeated exposure to conditions, which results in bodily injury or property damage during the policy period that is neither knowingly nor intentionally caused by or at the direction of the insured." *Nat'l Indem. Co.*, 499 P.3d at 540 (emphasis added).

Courts in this district have applied the cause theory to the same occurrence definition in this Policy. *See W. Nat'l Mut. Ins. Co. v. Rainbow Ranch Holdings,*

*LLC*, No. CV-23-05-BU-BMM, 2023 WL 8018558 (D. Mont. Nov. 20, 2023); *Charter Oak Fire Ins. Co. v. Sherner*, No. CV 22-132-BLG-SPW-TJC, 2023 WL 9289424 (D. Mont. Dec. 29, 2023), *adopted*, 2024 WL 183490 (D. Mont. Jan. 17, 2024). In *Rainbow Ranch*, allegations of faulty boiler installation, maintenance, room construction, and a failure to check on hotel guests "all contributed to the build-up of carbon monoxide," the sole cause of one guest's injuries and her husband's death. *Rainbow Ranch*, 2023 WL 8018558, at *6. The existence of "more than one contributing cause" did not change that result. *Rainbow Ranch*, 2023 WL 8018558, at *6 (citation modified). In *Charter Oak*, a wife's distress from witnessing her husband's burn treatment and from receiving post-explosion propane invoices was an effect of a single explosion and not a separate occurrence. *Charter Oak*, 2023 WL 9289424, at *5. The court observed that the cause theory "is designed to avoid the trap of infinite regression." *Charter Oak*, 2023 WL 9289424, at *5 (citation modified).

Mutual and Paul agree that the cause theory governs, but they disagree about how to apply it. Mutual argues that a "proximate cause" formulation is better suited to the Policy's language than the "liability event" formulation that Paul invokes. (Doc. 33 at 11–24). But the Montana Supreme Court has used neither label. *Heggem* cited authorities associated with both approaches when it adopted

the cause theory. *See Heggem*, 154 P.3d at 1195 (citing *CSX Transp., Inc. v. Cont'l Ins. Co.*, 680 A.2d 1082, 1091 (Md. App. Ct. 1996); *Mich. Chem. Corp. v. Am. Home Assur. Co.*, 728 F.2d 374, 379 (6th Cir. 1984)). And *National Indemnity* applied the cause theory without adopting either formulation. *Nat'l Indem. Co.*, 499 P.3d at 541–43.

The Court need not resolve which formulation Montana would adopt—proximate cause, as Mutual urges, or the liability-triggering-event approach Paul's authorities reflect. Both parties, and the Court, agree that the inquiry focuses on the insured's conduct that caused the underlying injuries. *See Heggem*, 154 P.3d at 1195; *Nat'l Indem. Co.*, 499 P.3d at 542–43. The Policy's definition of "occurrence," the underlying complaint's causation allegations, and the undisputed facts in this case produce the same answer under either label: there was one "occurrence."

**B. The Policy's "occurrence" definition treats exposure to the same harmful condition as a single occurrence, the undisputed facts show exposure to the same harmful condition, and the underlying complaint alleged that condition as the sole cause of the injuries.**

The cause theory is a method of interpreting the Policy's definition of "occurrence," and therefore the definition frames the inquiry. *See Heggem*, 154 P.3d at 1197; *Nat'l Indem. Co.*, 499 P.3d at 543 n.18. The Policy defines "occurrence" as "an accident, including continuous or repeated exposure to

substantially the same general harmful conditions." (Doc. 1-1 at 52). That language anticipates that a single accident may reach injured persons through continued or repeated exposures. And it makes the harmful condition, rather than the number of exposures, the unit of measure.

The undisputed record establishes that every underlying plaintiff was exposed to the same harmful condition: E. coli O157:H7 in Lot 1400 patties. (Doc. 22 at 4–5, ¶¶ 10, 17). Range's deliveries were the means by which that condition reached the restaurants and, through them, the diners. (Doc. 22 at 5, ¶¶ 13–16). Thus, multiple deliveries of the same contaminated Lot 1400 patties are, in the Policy's words, "continuous or repeated exposure to substantially the same general harmful conditions." (Doc. 1-1 at 52).

*Heggem* and *National Indemnity* also examined the causation allegations in the underlying complaint to determine the number of occurrences. *Heggem*, 154 P.3d at 1195–97; *Nat'l Indem. Co.*, 499 P.3d at 542–53. Paul's Third Amended Complaint alleged one harmful condition. She claimed that the source of the outbreak was "waygu beef from one lot number" and that her "burger was contaminated by *E. coli* O157:H7, causing the illness and injuries described" in the complaint. (Doc. 1-2 at 3, 11, ¶¶ 9, 26). Each negligence theory concerned the contaminated condition of the patties: their manufacture and sale, the raw materials

used, the selection and supervision of Lower Valley, and the absence of warnings about it. (Doc. 1-2 at 14–16, ¶¶ 48–62). No allegation attributes injury to something Range did when it made the deliveries. The complaint does not allege that delivery was misdirected, that Range delivered the wrong product, or that improper handling in transit introduced contamination. The deliveries appear in the complaint only as the route by which Lot 1400 reached the restaurants. (Doc. 1-2 at 10–11, ¶¶ 23–26).

That distinguishes this case from *National Indemnity*. There, each failure to warn the underlying plaintiffs of the dangers of asbestos was itself a wrongful omission: separate inspection reports, issued at different times and containing different information, reflected new culpable decisions. *Nat'l Indem. Co.*, 499 P.3d at 542–43. That is, each decision to withhold information from the plaintiffs gave rise to liability. *Nat'l Indem. Co.*, 499 P.3d at 542–43. Paul's complaint identifies no culpable decision specific to any delivery. (Doc. 1-2 at 10–11, ¶¶ 23–26). Whatever combination of conduct by Range, Lower Valley, and the restaurants produced the E. coli contamination here, that was the condition that Paul alleged caused the injuries. (Doc. 1-2 at 11, ¶ 26). *See Charter Oak*, 2023 WL 9289424, at *5 ("[E]vents can be parsed into several distinct stages, each describing the

ultimate cause in greater and greater detail. But the cause theory is designed to avoid the trap of infinite regression." (citation modified)).

In support of her interpretation that each delivery constituted an "occurrence," Paul principally relies on *Michigan Chemical Corp. v. American Home Assurance Co.*, 728 F.2d 374 (6th Cir. 1984) and *Maurice Pincoffs Co. v. Saint Paul Fire & Marine Ins. Co.*, 447 F.2d 204 (5th Cir. 1971). But those cases do not show that repeated deliveries of one contaminated lot are separate occurrences under this Policy.

In *Michigan Chemical*, the insured accidentally shipped a toxic flame retardant to farmers who ordered livestock feed supplement, causing injury to the farmers' animals. *Mich. Chem. Corp.*, 728 F.2d at 376. The court identified "the mis-shipment or mis-shipments" as the cause of the damages; each shipment was a separate occurrence because each constituted a negligent act of sending the wrong product. *Mich. Chem. Corp.*, 728 F.2d at 382–83. Range, by contrast, delivered the product the restaurants ordered. (Docs. 32-2, 33-3). It was the contaminated condition of that product that caused the injury. (Doc. 1-2 at 10, ¶ 23).

*Maurice Pincoffs Co.* is Paul's closest authority. In that case, the insured imported already-contaminated bird seed and sold it, in the original bags, to eight dealers. *Maurice Pincoffs Co.*, 447 F.2d at 205. Those dealers then sold the

contaminated bird seed to bird owners, and many of their birds died. *Maurice Pincoffs Co.*, 447 F.2d at 205. The Fifth Circuit reasoned that if the insured had destroyed the seed before sale, "there would be no occurrence at all," but that "for each of the eight sales . . . there was a new exposure and another occurrence." *Maurice Pincoffs Co.*, 447 F.2d at 206. That policy, however, defined "occurrence" as "an accident, including injurious exposure to conditions." *Maurice Pincoffs Co.*, 447 F.2d at 206. It contained neither the "continuous or repeated" nor "substantially the same general harmful conditions" language at issue in this Policy. (Doc. 1-1 at 52). *Maurice Pincoffs Co.* therefore did not construe the language that treats continuous or repeated exposure to the same condition as "an accident," (Doc. 1-1 at 52), and Paul's contention that the definition "closely mirror[s]" the Policy overlooks those key omitted terms, (Doc. 35 at 8 n.2).

And the Court is not persuaded by the reasoning that the seed, here the Lot 1400 patties, could have been destroyed before sale. Release into commerce is a precondition to liability for every product, whether the insured makes one delivery or fifty and whether it manufactures or distributes. *See Westchester Surplus Lines Ins. Co. v. Maverick Tube Corp.*, 722 F. Supp. 2d 787, 797 (S.D. Tex. 2010) (explaining that manufacturer "could have prevented any liability by deciding not

to distribute the product" but that "would not have prevented the causal chain from forming").

Additionally, Paul's interpretation would not count all fifteen or more deliveries as "occurrences." The Policy applies only to bodily injury "caused by an 'occurrence.'" (Doc. 1-1 at 38). So deliveries to the three restaurants that had no reported illnesses implicate no coverage, (Doc. 30-1 at 1), and Paul does not identify which of Range's deliveries supplied her burger, (Doc. 1-2 at 10–11, ¶¶ 25–26). The number of occurrences would thus depend on the number of deliveries that happened to produce illness, tying the count to the distribution of injuries instead of their cause. That resembles the effects test that Montana has rejected. *See Heggem*, 154 P.3d at 1195; *Nat'l Indem. Co.*, 499 P.3d at 542.

The remaining authorities that Paul invokes involve multiple harmful conditions or independently injurious acts. In *Arizona Property & Casualty Ins. Guaranty Fund v. Helme*, two doctors separately failed, on different days and in different contexts, to review x-rays. *Ariz. Prop. & Cas. Ins. Guar. Fund v. Helme*, 735 P.2d 451, 456–58 (Ariz. 1897); *see Heggem*, 154 P.3d at 1195 (distinguishing *Helme*). In the Florida shooting cases, each gunshot was a new act of violence producing a new injury. *See N.H. Ins. Co. v. RLI Ins. Co.*, 807 So. 2d 171, 172 (Fla. Dist. Ct. App. 2002); *Am. Indem. Co. v. McQuaig*, 435 So. 2d 414, 416 (Fla.

Dist. Ct. App. 1983). Here, there was one contaminated lot, and there are no allegations or evidence that Range's deliveries caused new harmful conditions. Each delivery carried the same potentially harmful condition.

### C. Neither the absence of a batch clause nor the reasonable expectations doctrine changes the result.

Paul argues that nothing in the Policy states that "one lot equals one occurrence." (Doc. 31 at 23–28). In her view, Mutual could have included a "lot or batch" endorsement and its failure to do so should be construed against it, and that no reasonable insured distributing food products would expect separate deliveries to be treated as a single occurrence. (Doc. 31 at 23–28).

The Court imposes no "one lot, one occurrence" rule. It applies the Policy's definition, which treats "continuous or repeated exposure to substantially the same general harmful conditions" as included in "an accident." (Doc. 1-1 at 52). Courts construing the same definition have found one occurrence in E. coli contamination cases without any batch clause. *See Travelers Prop. Cas. Co. of Am. v. RSUI Indem. Co.*, 844 F. Supp. 2d 933, 935 (N.D. Ill. 2012); *W. World Ins. Co. v. Wilkie*, No. 5:06-CV-64-H, 2007 WL 3256947, at *1 (E.D.N.C. Nov. 2, 2007). And Montana has determined that the cause theory governs the number of occurrences, holding that the same occurrence definition at issue here was unambiguous. *See*

*Heggem*, 154 P.3d at 1197. That construction applies whether it favors the insurer or the insured. *See Mich. Chem. Co.*, 728 F.2d at 381 n.7.

The reasonable expectations doctrine does not assist Paul, either. Montana honors the objectively reasonable expectations of insurance purchasers, but expectations contrary to clear policy provisions are not objectively reasonable. *See Giacomelli v. Scottsdale Ins. Co.*, 221 P.3d 666, 674 (Mont. 2009). The Policy's declarations state a $1,000,000 "each occurrence" limit; the Limits of Insurance section applies that limit for "any one 'occurrence'" regardless of the number of claims, suits, or claimants; and the definition of "occurrence" expressly includes continuous or repeated exposure to the same harmful conditions. (Doc. 1-1 at 15, 47–48, 52). An expectation that multiple deliveries of the same contaminated lot would each carry a separate $1,000,000 limit runs contrary to those provisions. Because the doctrine does not apply on its own terms, the Court need not decide whether Paul, as a non-purchaser, can invoke it. (Doc. 33 at 26).

### D. The underlying complaint does not allege that the restaurants' cooking decisions independently caused the injuries.

Paul also argues that the restaurants' independent cooking decisions were intervening acts that broke any continuous causal chain. (Doc. 35 at 11–13). In support, she points to Montana's Administrative Rules incorporation of the Center for Disease Control's Food Code and the absence of illness at some restaurants that

received deliveries. (Doc. 35 at 11–13). This argument fails even if the Administrative Rule facts are considered, so the Court need not resolve Mutual's objections that they are outside the scope of L. R. 56.1. (Doc. 34 at 4–5, ¶¶ 48–49).

Paul's argument actually undermines her theory of Range's liability. If the restaurants' conduct superseded Range's, the consequence would be that Range is not liable. That is a question for the underlying tort action, *see Heggem*, 154 P.3d at 1202 (Nelson, J., specially concurring), and does not show that there was more than one "occurrence." If anything, Paul's position would count occurrences by each cooking decision or each burger served, another effects-based measure that Paul does not advocate.

The argument is also contrary to Paul's complaint. She alleged that the contaminated beef reached her "without any change in its defective condition," (Doc. 1-2 at 12, ¶ 35), that E. coli. O157:H7 in ground beef "that is only slightly undercooked can result in infection," (Doc. 1-2 at 9, ¶ 21), and that regulators have refused to shift responsibility for such infections to food handlers, (Doc. 1-2 at 9–10, ¶ 22). The complaint thus treats restaurant preparation as a foreseeable part of the same causal sequence, not a break in it.

## IV. Conclusion

For the reasons discussed above, the contamination of Lot 1400 with E. coli caused the underlying plaintiffs' injuries, so there was only one "occurrence" under the Policy. Thus, the Policy's "each occurrence" limit of $1,000,000 applies. Accordingly,

IT IS ORDERED that Mutual's motion for summary judgment (Doc. 28) is GRANTED, and Paul's cross-motion for summary judgment (Doc. 32) is DENIED.

The Clerk of Court is directed to enter judgment in favor of Plaintiff Mutual of Enumclaw Insurance Company and against Defendants Alexis Paul and Range Land & Cattle Co., LLC. The Clerk of Court is directed to close the case file.

DATED this 30th day of September, 2026.

Kathleen L. DeSoto

Kathleen L. DeSoto
United States Magistrate Judge